Good morning, Your Honor. I'm Edwin F. Alden, and I represent Mr. Guizar in this matter. This is a case of presence and proximity alone. The defendant traveled to Washington from California to attend a First Communion of a niece in eastern Washington. He rented a vehicle for that purpose because he didn't own a vehicle that was reliable to get him to eastern Washington. He shared expenses particularly with Mr. Tapia Cueva, a relative, and Mr. Cueva invited Mr. Cristobal Fernandez to travel with him. Mr. Fernandez apparently had friends in the area. Were all three of them going for this First Communion? No, Your Honor. Mr. Cuevas was and Mr. Guizar were because they were family. Mr. Cristobal Fernandez was not family. He apparently was a friend of Mr. Cuevas or an acquaintance of Mr. Cuevas. He was non-family. What was the time of the trip in comparison to the day of the First Communion? Was it right away? I think it was close. Yes, I think they made the arrangements on May 8th, I think, and the First Communion was May 20th or something like that. Yes. So but I think they arrived on the eve of when they actually departed California. I think they arrived on the eve of the First Communion. It was like the next day or two days later or some such thing. Where were all the extra miles from? That was unexplained. Is the lack of explanation a factor that the government can fairly cite to support the decision? I think it's really irrelevant. The fact that they may have paid some question about client story is to rent a car to come to this First Communion. And it's 700 miles. But somehow I had 1600 miles mileage. Where's the other 900 miles? I don't think it's particularly relevant to the offense here because they're tracked from the time they arrived. And actually in eastern eastern Oregon, the miles are just not accounted for. Nothing is suggested that the miles were inappropriately. I mean, they didn't go anywhere. They seem to have traveled, according to all accounts, directly to the state of Washington and into eastern Oregon, which is just across the border from the Tri-Cities. Actually, it's like 30 miles. So no, the miles are unaccounted for in that no reasonable or unreasonable. There's no travel that they it's explained by anybody that would suggest where the extra miles went, unless you rented the car early and tootled around portions of California. But it's just unexplained. And I did not particularly consider it significant in terms of any kind of criminal conduct. But it's significant from the standpoint of the credibility of the explanation. I don't think that it is. I don't think it affects the credibility because there is no malevolent purpose associated with the extra miles. I mean, no one is suggesting that they they they went to Nevada or somewhere to buy methamphetamine. I mean, I mean, the miles are just there. And who knows where they went or what they did or whether the mileage was correct on the vehicle. I mean, there's all kinds of there's no suggestion that those miles were used for some malevolent purpose. The most the important thing, I think, in this case to me is the fact that the only testimony, the only evidence that Mr. Gazar did anything wrong is provided by Mr. Ayala. Mr. Ayala, I don't say in the pejorative sense, is an idiot. He speaks no language fluently, not even his native language, Spanish. He only understands his native language on a street level, according to the interpreter. And that's in the government's brief. He speaks no English. He doesn't read nor write requirements for the jury's. I think his ability to observe and understand what goes on around him. Yes. Or couldn't a jury conclude, on the other hand, that somebody that simple minded is too simple to lie. That within the province of the jury. Yes, I would give you that. Yes, that's true. But in this case, the simpleness demonstrates itself in basically a refusal to answer the simplest question. Such as and I've put it out at great length in my memorandum. Mr. Ayala, did Mr. Fernandez show you the methamphetamine? He never would answer the question. He seemed to be programmed to provide a given answer. OK, or you might fairly suggest he didn't want to give an answer to that question because he didn't like the implications it had for the rest of the story. There are lots of reasons why witnesses. Yes. Fight mightily to avoid answering. That's a question and a question. Did you have a conversation with Mr. Gazer? Well, we did so and we did this. No, no. Did you talk to Mr. Gazer? And the reason for asking that question is real simple. My client throughout these proceedings is never suggested to have a single conversation with Mr. Fernandez or with Mr. Ayala or with the confidential informant named David. It's interesting. And in fact, I actually I like the government's statement of facts in that regard. Best. They point out that Mr. Fernandez were the defendant and co-defendant. Mr. Cordova, y'all are anticipating the delivery of the methamphetamine. Mr. Hernandez, Mr. Hernandez and Mr. Cordova, y'all have discussed the drug transaction as the defendant listened. Mr. Cordova, Ayala was having a telephone conversation with the confidential informant regarding delivery of the methamphetamine. Mr. Fernandez transferred the methamphetamine from the California car to Cordova, Ayala's vehicle. Then they had in plain view of the defendant. My client said he never saw it. He couldn't explain its presence in the car. He thought the sack had oranges in it because that's what he bought in California. The this is like as I opened when I said this is a case of proximity alone. You can go through the record page by page and the government's statement of facts. And you will find that Mr. Gays are never had a significant conversation with Mr. Ayala ever. Mr. Ayala would not even admit to having talked to Mr. Gays are. He was merely there. He was merely present. He rented the car. Before your time passes, can you make a point of addressing the issue raised by the government on the cross appeal as well? Yes. I think the interesting point there is the Supreme Court gave us the promise that we're discussing the perjury suggestion. The Supreme Court gave us the promise that, well, a defendant by merely pleading not guilty doesn't run the risk of being penalized for that because the district court must make specific findings. And that's to protect the defendant. In this case, at the urging of the government, Judge Shea refused to make those findings. And without those findings, that increase is not possible. And the judge specifically and intentionally did not make those findings. Is there any circumstance in your view in which a trial judge is required to make the findings one way or another? In other words, even if the judge comes out your way, the government seems to be saying any time there's doubt about the defendant's testimony, the judge has to go through the litany and say there's this factor and this element and this element and find one way or the other. Do you agree or disagree with that? I disagree. In fact, I go back to the promise that the Supreme Court gave with this is that the judge, in order to provide for this increase, the judge must make those particular findings. And if the court declines to do so, then it's not made. That is a protection for the defendant, it seems to me, from the promise in the Supreme Court that you set out. I wanted to make one other point. Mr. Gazer, in this case, was convicted solely. It has to be solely on the basis of what Mr. Ayala says Mr. Fernandez said. Even though it's referenced in the government's memorandum, Mr. Fernandez did not testify in this case, and he refused to be interviewed. So the only – it's offensive to me that a defendant can be convicted based upon the pure hearsay statement of particularly a witness like Mr. Ayala, who's – Well, as a proposition of law, do you contest what I think is pretty well-established conclusion, that, in fact, you can have a conviction based upon a co-conspirator's hearsay testimony? If it's in furtherance. And in this case, it wasn't. This was – and it's clear from the record that Mr. Fernandez was explaining the way the presence of Mr. Tapio Cueva and Mr. Gazer. Oh, well, they're with me. They are my friends. That doesn't further the conspiracy. It may allay the fears of Mr. Ayala, but from the existing cases, that is not in furtherance. And there are similar cases, but obviously they're all case-specific, and we can – I mean, there's differences. I mean, there's obvious differences. But the point is, in this case, the only testimony that provides for a conspiracy, Mr. Gazer is never indicated, never says, and is never engaged in a conversation which would suggest to anybody that he was participating in anything other than a trip to a First Communion. Counsel, if you want to save some rebuttal time, you're next. Yes. Thank you. Thank you. Mr. Kirk. May it please the Court. Jane Kirk on behalf of the United States. I will first address the issue of the sufficiency of the evidence. The – Mr. Alden argues that the only evidence suggesting that Mr. Gazer was involved in this conspiracy was the testimony – here's a statement of Mr. Fernandez related by Mr. Cordoba Ayala, the government's witness. I would respectfully disagree. There was other evidence. There was the fact that Mr. Gazer rented the vehicle, that he drove up from California, that he was present at the place where the drugs were transferred from one car to another. If he was just coming up here for a baptism, why stay at the place where the drug transaction started, where they transferred the drugs from Mr. Fernandez to Mr. Cordoba Ayala? He could have dropped Mr. Fernandez off and gone on about his business. Instead, he stayed there. They were his drugs. The government would suggest that from that – Could he be present enough? No, Your Honor. It's absolutely correct. The mere presence is not sufficient. But the mere presence supports the later statements, the later hearsay statements, that he was – he rented the vehicle, he was present during all this time with the drug transaction. In fact, he was in the vehicle as the vehicle – as the California vehicle followed the – Mr. Cordoba Ayala's vehicle that had the methamphetamine at that time over to the transfer place in Washington State. So, again, he was following the drugs. He was protecting his investment. And there was testimony that he was to share in the proceeds. Yes, there was, Your Honor. And this is – this could go toward mere presence, but he was also in close proximity when Mr. Fernandez and Mr. Cordoba Ayala were talking about how the deal was going to go down. And so he was aware that it was going to be a drug deal because he was there when they were discussing it at the store early in the morning and later at the house outside by the cars. So Mr. Hazar was aware of the drug deal, clearly, and then there was the testimony that said that he was going to share in the drug proceeds. So that, with all the other circumstantial evidence of showing up in Oregon with no other clothes, no change of clothes for going to a church for a baptism, no presence, very little money to return, and they're just – these things could not be explained away. And then his own testimony, it just seemed incredible that – particularly at one point he was explaining how they pay for gas coming up to Washington. He said that he and Mr. Tapia Cuevas traded off paying for the gas. And the next question was, oh, so you've been up here together before? Oh, no, no, no. We've never traveled up here before together. And yet just before, he said, this is how we do it when we come up here. And there's a little bit of confusion, I would perceive, as to the trips, that there was a car rental at the end of – excuse me – at the end of April into early May, a three- or four-day car rental by Mr. Hazar. And that's where the trip mileage was recorded, the total trip mileage of about 1,500, 1,600 miles. That occurred about a week before this trip. And that would explain his statement, when Mr. Tapia Cuevas and I come up here, we trade off paying for the gas. I think you could infer from that statement that they had been up here before. The mileage on that rental car was 1,500, 1,600 miles. The round trip between the defendant's hometown and the Tri-Cities in Washington is 700-some miles. So it would all flow together. How did the testimony about the sharing of the proceeds come in? That came in through Mr. Cordova Ayala. And it was at the point that they were at Mr. Cordova Ayala's house, and he had just spoken with the undercover – the confidential informant, and had set up the deal so that they were going to go and deliver the drugs. And Mr. Cordova Ayala spoke on the phone in his house, and the other three were outside of the house. They were coming in as Mr. Cordova Ayala terminated that phone call, and he said, let's go outside and we're going to discuss this, how it's going to happen. And it was during that conversation that it came up how the proceeds were going to be shared, and that Mr. It was Cordova Ayala's testimony at the trial. Yes, that that's what he heard Mr. Fernandez and the other two speaking of. And also on page 63 of the supplemental excerpts of record, there's a reference to that conversation. And we were together, the four together, if the deal went through, they were all going to share money. Yes, yes. So there's that. And so I think that with all of the circumstantial evidence and those clear, concrete statements that he was going to share in the money, that the evidence was sufficient to support the conviction. I would like to turn now to the issue of whether there should be an obstruction of justice enhancement. Counsel, let me just start out by saying that, at least as to me, kind of an uphill argument here. Okay. I was unable to find any case in which the district court is told that when the defendant's credibility is in doubt, you must go through the exercise of making findings one way or another on this possible enhancement. It seems to be within the discretion of the court whether to go that direction. The cases seem to come up where the court has attempted to apply the enhancement and has said either that's good enough or it's not good enough, but where the court has initially decided that it's going to go that route. What's the dividing line? How do we know when we are facing a case, in your view, that the court has to consider, not just consider in the abstract, but has to go through all of the elements of perjury? Your Honor, I would suggest when the case would arise when it would be an abuse of discretion to not apply it. And I would also suggest that this case is such a case that it would be an abuse of discretion to say that Mr. Hazar did not obstruct justice when he took the stand and he tried to convince the jury that he was an innocent person. So, in effect, any time the defendant takes the stand and testifies in a manner that's contrary to the jury's verdict, you would infer from that obstruction of justice that requires the application of the two-level enhancement? No, I would not, Your Honor. I believe that Dunigan sets out examples where the defendant could take the stand and say they lacked intent or it was just a mistake. I'm saying when the defendant testifies in a way that's contrary to the jury's verdict, where there's a factual distinction between what the defendant says and what the jury finds, I mean, to say you lack intent, that may be factually false if the jury finds otherwise. Why is that any less an obstruction of justice? Because that is one of the exceptions carved out by Dunigan. I think that maybe I'm trying to see what words I can use, that there are cases where the defendant can take the stand and there would not be an obstruction of justice even though the jury found them guilty, where they take the stand and say it was duress and the jury doesn't believe it and still convicts them. But here where I think that where they take the stand and, oh, where they take the stand and say I did not do it, I didn't, and in this case the judge believed it. In other words, you have a situation here in which the defendant and some of his family members testified one way and another witness testifies to the contrary. The finder of fact can go either way. That's correct. I want you to assume for the purpose of my question that the jury believed the government witness. The judge maybe believed the defendant. Now, he has to sentence him within the guidelines. Why does he have to go on to agree with the jury explicitly? In other words, in order to do the enhancement, the judge has to find the facts in a certain way. And so what you're really doing is removing that discretion from the judge as finder of fact at the sentencing level, it seems to me. You're correct. The judge does have to find that the defendant lied. And I think from this record you can find that because the judge did say that your testimony was not borne out by the evidence. He said that at sentencing. And he's also pretty careful to say the jury believed so-and-so. He never actually says he does. Well, I would respectfully disagree. I believe that he does. The passage you state is correct. He says your testimony isn't borne out or your version isn't borne out by the testimony. But then he says, you know, the jury disbelieved this, the jury found that, and I'm sentencing you based on that. But I guess whether, at least theoretically, my problem is still a problem, even if it's not. Well, I would say that he says it is not borne out, and then he says and further. Then he talks about the jury didn't believe it. But there's also the evidence that I believe this Court can consider of the sentencing of Mr. Fernandez. And Mr. Fernandez, the co-defendant that did not testify in this trial, had said that Mr. Gazar supplied the drugs. And this judge gave Mr. Fernandez a safety valve for providing complete and truthful information to the government about this transaction. That still leaves us with this idea that somehow if there is evidence, whether inferential or direct, that a defendant's testimony wasn't truthful, you would require this enhancement. And I guess I just don't see why the judge has to go down that road if the judge doesn't want to. Well, I guess it occurs to me that if the judge has the discretion to never go down that road, then the government would never be able to get a judge to follow the law. Well, if you persuade the judge that he ought to go down that road. I mean, it seems to me if the government's position is that the judge doesn't have discretion, then the sentencing guidelines can be written in such a way to eliminate the discretion by saying if jury finds this, then result is that. By asking the district court to make findings separate and apart from the jury's verdict, doesn't that seem to suggest that the district judge is supposed to exercise judgment and discretion with regard to that particular question? I agree. So why can't we say the district judge, he knew the issue. You were making the argument or the government was making the argument for the enhancement. The district court elected not to apply it. Right. That's not what they do. You're absolutely correct. And I'm saying that in this instance, there was an abuse of discretion because of the totality of the evidence out there, that this very judge found the other co-defendant truthful when he said that Mr. Geysar supplied the drugs. But that was then and this is now. Maybe this — maybe the testimony in this case gave the thoughts about what he did in the other case. I mean, you just — it seems to me that you are arguing a position that locks the district court out of the exercise of discretion whether to go down the road of this enhancement or not every time the jury disbelieves the defendant who testifies. Your Honor, I would respectfully suggest that that's not my position. That I think in this particular case, because of the evidence and because of the way the judge was — this version of the facts that supported the defendant's testimony, that it was an abuse of discretion to not do it. I'm not saying that in every case that would be the outcome. But in this case where there was that specific finding that Mr. Fernandez was truthful and said that this guy is the guy that gave us the drugs. Would it be any finding that — or any factual matter that the — this would apply to? For example, does it have to be material to the judgment or can it be just not telling the truth on the stand about anything? No. It must be material. The testimony must be material and it must be not from confusion, mistake, and it must be an untruth. So I think this case is distinguishable. It's a unique case, I will admit, but I think it is all there. Thank you. Thank you. Thank you, Your Honor. I would like to leave the Court with just why I think this case doesn't pass the smell test. Page 19 of my memorandum, the question to Mr. Ayala was, you talked to Mr. Gazer about what you were going to do with the cash. Is that your testimony? Answer, well, about the cash, I just simply told Cristobal, and Cristobal was sure was to share the cash amongst the three of them and the four of us. Mr. Ayala received benefit for his testimony, and he wanted to testify the way the government wanted him to testify in this case. He never answered a single question straightforward, regardless of how simple the question was. This wasn't a complex question. This wasn't a compound question. It was, did you talk to Mr. Gazer? And his answer was, I talked to Cristobal. He avoids the question. At no time is there anything in this record that Mr. Gazer acceded to, conceded, or necessarily understood that there was a drug transaction going on. There is zero evidence. The only evidence in this case is what Mr. Ayala said Mr. Fernandez said, and we don't know if Mr. Fernandez said it. And I can't respond to the government's argument concerning what Mr. Fernandez got or didn't get, because he didn't testify in this case and was not available to even interview. So I'm going to leave that. All I know is what Mr. Ayala, who doesn't even understand Spanish well, says Mr. Fernandez said, but he was very careful never to answer the simple question, did you talk to Mr. Gazer? If the answer to that would have been yes, I probably wouldn't be standing here today. But the point is, Mr. Gazer was convicted solely, I mean, solely on the basis of that conversation that Mr. Ayala had with Mr. Fernandez. Thank you. Thank you. The case just argued is submitted. We will take a short break before the remainder of the calendar. All rise. This court stands at recess. Thank you.
judges: Hug, Graber, Clifton